**INDEPENDENT WIRELESS ONE CORPORATION and Independent Wireless One Leased Realty Corporation, Plaintiffs,**

v.

**TOWN OF CHARLOTTE, Town of Charlotte Zoning Board of Adjustment, Town of Charlotte Planning Commission and Town of Charlotte Zoning Administrator, Defendants.**

No. 2:02–CV–261.

United States District Court, D. Vermont.

Jan. 17, 2003.

Andrew D. Manitsky, Gravel and Shea, Burlington, VT, John F. Clark, Perkins Coie, LLP, Washington, DC, for Plaintiffs.

James F. Carroll, English, Carroll & Ritter, P.C., Middlebury, VT, Robert Earle Fletcher, Jr., Joseph S. McLean, Stitzel, Page & Fletcher, PC, Burlington, VT, for Defendants.

## OPINION AND ORDER

### (Paper 3)

NIEDERMEIER, United States Magistrate Judge.

Plaintiffs Independent Wireless One Corporation and Independent Wireless One Leased Realty Corporation ("IWO") have brought this action against Defendants Town of Charlotte, Town of Charlotte Zoning Board of Adjustment, Town of Charlotte Planning Commission, and Town of Charlotte Zoning Administrator ("Charlotte") under the Telecommunications Act of 1996, 47 U.S.C. § 332(c), appealing two separate decisions denying IWO's applications for conditional use approval to install,

operate, and maintain telecommunications antennas on privately owned silos in the Town. This case is currently before the Court on IWO's motion for a preliminary injunction ordering Charlotte to issue all necessary permits for construction and maintenance of the antennas for the duration of this proceeding.

For the following reasons, IWO's Motion is GRANTED.

### Background

In April 2002, IWO, which is engaged in the business of designing, constructing and operating Sprint PCS's Service Area Network for Vermont, sought two conditional use permits from the Charlotte Zoning Board of Adjustment ("ZBA") in order to install an antenna and associated concrete pad on each of two existing farm silos (with no increase in height or any other change to the structures (silos)).[1] These permits were denied on September 9 and September 18, 2002.[2]

Under the Charlotte Zoning Bylaws, the ZBA may not grant an application for a conditional use permit unless the application meets the requirements of § 6.4(E) & (F). The General Standards, set out in § 6.4(E) provide:

A permit shall be granted by the Board of Adjustment after the applicant presents information to demonstrate that the proposal will not adversely affect the following:

1. The capacity of existing planned community facilities or services

2. The character of the neighborhood, area, or district affected

3. Traffic on the roads and highways in the vicinity

4. The Town Plan and all Town regulations in effect

5. The utilization of renewable energy resources

6. Existing water supplies and aquifers

7. Views and vistas, natural areas, wildlife habitat, productive woodlands, historic sites, and agricultural land, as designated in the Town Plan.

(Charlotte Zoning Bylaws, § 6.4(E), Paper 16, exhibit 1.) The ZBA found that each of IWO's applications met all these general conditional use standards. (Paper 1, exhibit C at 5–7; exhibit D at 4–6.)

The ZBA determined that only two of the Specific Standards, set out in § 6.4(F) applied to IWO's applications. These provisions provide:

A permit shall be granted only upon a finding by the Board of Adjustment that the following specific standards, in addition to the standards and requirements in the district regulations, will be met:

1. Obnoxious or excessive noise, smoke, vibration, dust, glare, odors, electrical interference or heat that is detectable at the boundaries of the lot shall not be generated . . .

7. In determining the appropriateness of the use in the district, the Board shall consider the scale of the proposal in relation to the scale of existing uses and buildings and the effect of the use on the continued enjoyment and access to existing and

---

1. From photographic simulations submitted by IWO to the ZBA, the antennas will not be noticeable as they appear to be the same color as the silos and will not exceed the height of the silos. (Paper 6, exhibit 6.)

2. After the initial denials in September, as permitted under the Charlotte Zoning Bylaws, residents of Charlotte asked the ZBA to reconsider several aspects of its decision. (Paper 10, exhibit 1.) Charlotte declined to reopen the decision on October 24, 2002, rendering the decisions final. (*Id.*)

approved uses in the vicinity of the proposed use.

(Charlotte Zoning Bylaws, § 6.4(E), Paper 16, exhibit 1.) The ZBA found that IWO met these standards in both of its applications. (Paper 1, exhibit C at 5–7; exhibit D at 4–6.)

In addition to meeting the requirements of § 6.4(E) and (F), an applicant for a conditional use permit must meet specific requirements set out in Chapter 9 of the Charlotte Zoning Bylaws. The requirements of § 9.6.1(A)-(R) relate to information that the applicant must include with the application. (Charlotte Zoning Bylaws § 9.6.1, Paper 16, exhibit 1.) The ZBA found that IWO had met all of the requirements of § 9.6.1 on each of its applications.[3] (Paper 1, exhibit C at app. A; exhibit D at app. A.) The ZBA also addressed the requirements in § 9.8, relating to general project requirements and standards. (Charlotte Zoning Bylaws, § 9.8, Paper 16, exhibit 1 at 61–62.) The ZBA found that §§ 9.8(A) and 9.8(E) were not applicable to IWO's applications and that the provisions of § 9.8(G) had been met. (Paper 1, exhibit C at 9; exhibit D at 8.) The ZBA also found that §§ 9.8(B)–9.8(D) and § 9.8(F) either had been or would be reviewed by the Planning Commission in conjunction with the applications. (Paper

1, exhibit C at 9; exhibit D at 8.) Finally, the ZBA found, upon advice of counsel, that the provisions of § 9.8(H) were either inapplicable or unenforceable under the Telecommunications Act of 1996 ("the TCA") and therefore could not be applied to IWO's applications.[4]

The ZBA ultimately denied IWO's applications because IWO failed to satisfy the requirements of § 9.7 of the Charlotte Zoning Bylaws. This section states:

Section 9.7  Evidence of Need

A. Existing Coverage: Applicant shall provide written documentation to the Zoning Board demonstrating that existing telecommunications facility sites within a 30–mile radius of the proposed site cannot reasonably be made to provide adequate coverage and/or adequate capacity to areas within the town which lack such coverage and/or capacity. The documentation shall include, for each telecommunications facility site listed which is owned or operated by the applicant, the exact location (in longitude and latitude, to degrees, minutes, and seconds to the nearest tenth), ground elevation, height of tower or structure, type of antennas, antenna gain, height of antennas on tower or structure, output frequency, number of channels, power

---

**3.** § 9.6.1(F)(4) requires that applications include "A report from qualified and Vermont licensed engineer(s) that: ... 4. Provides evidence of need, as described in Section 9.7 of this Chapter." (Paper 16, exhibit 1 at 56–57.) In each of the decisions, the ZBA noted "The applicant has provided evidence on the issue of need. *But see* discussion under § 9.7 of Zoning Bylaws." (Paper 1, exhibit C at app. A; exhibit D at app. A) The decisions also noted that, as required by § 9.6.1(F)(12), "As discussed below, the applicant submitted additional information on the issue of need at the request of the ZBA. No other information was required by the ZBA." (*Id.*)

**4.** § 9.8(H)(2) of the Charlotte Zoning Bylaws provides that "No telecommunications facility

or tower ... shall be located ... [c]loser than 1,500 feet horizontally to any structure existing at the time of the application which is used as a primary or secondary residence, school property ... or to any other building used regularly by the public." (Charlotte Zoning Bylaws § 9.8(H)(2), Paper 16, exhibit 1 at 61–62.) The ZBA's attorneys, after consulting the Planning Commission hearings relating to the adoption of this provision, concluded that the purpose of the provision was to regulate the placement of telecommunications facilities based on the potential health effects and concluded that this provision was unenforceable under the TCA. (Paper 1, exhibit C, app. B; exhibit D, app. B.)

input and maximum power output per channel. Potential adjustments to these existing telecommunications facility sites, including changes in antenna type, orientation, gain, height or power output shall be specified. Tiled coverage plots showing each of these telecommunications facility sites, as they exist, and with adjustments as above, shall be provided as part of the application.

B. Use of Repeaters: The applicant shall demonstrate that it is not reasonably able to create adequate coverage in the Town of Charlotte from wireless base stations located in other towns or to fill holes within the area of otherwise adequate coverage by use of repeaters. Applicants shall detail the number, location, power output, and coverage of any proposed Repeaters in their system and provide engineering data to justify their use.

C. Five–Year Plan: All applications shall be accompanied by a written five-year plan for the utilization of the proposed facilities. This plan should include justification for capacity in excess of immediate needs, as well as plans for any further development within the town.

(Charlotte Zoning Bylaws § 9.7, Paper 16, exhibit 1 at 60–61.) In denying IWO's applications, the ZBA stated that "IWO presented credible evidence regarding the coverage that currently exists from *its* facilities, the coverage that *it* seeks, and

(during the reopened proceedings) the coverage that *it* could purportedly obtain from collocating on existing telecommunications facilities." [5] (Paper 1, exhibit C at 8; exhibit D at 7.) In other words, the ZBA does not seem to dispute the fact that IWO has a gap in the service it currently provides. [6] The ZBA found, however, that § 9.7 was intended "to minimize the proliferation of telecommunications facilities once adequate coverage has been provided within the Town. Given the coverage provided by Verizon and Cellular One, there is no significant gap in coverage that necessitates the provision of redundant service by IWO." (Paper 1, exhibit C at 9; exhibit D at 8.) In addition, the ZBA noted that many of IWO's customers could be serviced through roaming, and that "IWO has not explained why service provided through roaming is unreasonable or inadequate." (Paper 1, exhibit C at 9; exhibit D at 8.) Accordingly, the ZBA concluded that "adequate personal wireless service coverage already exists in Charlotte," and denied IWO's applications solely on the basis of its failure to meet the standards set out in § 9.7. (*Id.*)

IWO filed an action against Charlotte in this Court on October 9, 2002, challenging both denials under the TCA. On November 19, 2002, IWO filed a motion for a preliminary injunction ordering Charlotte to issue all necessary permits to install and operate the antennas.

**5.** In support of its applications, IWO submitted a five year plan regarding both applications, a letter from Kwasi Addo–Donkoh, an RF engineer, stating that "There is currently no transmitter in the specified area of Charlotte to serve as a donor site for a repeater. As a result, a repeater cannot be operational in this vicinity at the present time." (Paper 1, exhibit E.) IWO also presented evidence of its facilities in the area and of the fact that IWO "currently provides poor coverage in the Town of Charlotte. The area where coverage is provided is extremely limited and the service is not reliable." (*Id.*, exhibit E, Memo from Will Simonelli dated 7/29/2002.)

**6.** As noted, the ZBA accepted IWO's evidence of a gap in its own service. The decision does not mention the extent of the gap, but affidavits submitted in conjunction with this case indicate that the gap covers a three to four mile stretch along Route 7. In addition, the ZBA took notice of their own experience with Verizon and Cellular One Service, and concluded that adequate wireless coverage existed in the town.

## Discussion

### 1. Telecommunications Act of 1996

■ The TCA was intended "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition ..." H.R. Conf. Rep. No. 104–458, at 206 (1996). Congress sought to strike "a deliberate compromise between two competing aims-to facilitate nationally the growth of wireless telephone service and to maintain substantial local control of siting of towers." *Patterson v. Omnipoint Communications, Inc.*, 122 F.Supp.2d 222, 226 (D.Mass.2000) (quoting *Town of Amherst, New Hampshire v. Omnipoint*, 173 F.3d 9, 13 (1st Cir.1999)). To achieve this goal, Congress preserved local zoning authority with respect to the siting of wireless facilities, but placed specific limitations on the local zoning authorities and made their decisions subject to review by federal courts. 47 U.S.C. § 332(c)(7).

The TCA establishes procedural requirements that local zoning boards must comply with. *See Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir.1999). The TCA requires that any decision denying an application for a permit be in writing and supported by substantial evidence. 47 U.S.C. § 332(c)(7)(B)(iii). In addition, the TCA imposes substantive limitations on local zoning boards. Decisions of local zoning boards may not "prohibit or have the effect of prohibiting the provision of personal wireless services." 42 U.S.C. § 332(7)(B)(i)(II). In addition, decisions of local zoning boards may not "unreasonably discriminate among providers of functionally equivalent services ...." 47 U.S.C. § 332(c)(7)(B)(I).

Since the passage of the TCA, federal courts have been called upon repeatedly to decide disputes between local zoning authorities and wireless providers. These disputes arise from the inherent tension created by the TCA. Traditionally, a federal court's review of a local zoning board decision is highly deferential, limited in scope to determining the constitutionality of the decision under a rational basis review standard. *See Oyster Bay*, 166 F.3d at 493 (citing *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981)). In contrast, decisions that are subject to the TCA are reviewed under the less deferential substantial evidence standard, the traditional standard used by federal courts to review agency actions. *Id.* at 493–494.

### 2. Technology

Sprint PCS is the holder of a Federal Communications Commission ("FCC") license authorizing the provision of PCS services in the 1900 MHz frequency band to the MTA 001 New York market. (Paper 6, exhibit 1.) This market includes New York, New Jersey, Northeastern Pennsylvania, and portions of Vermont, including the Town of Charlotte. (*Id.*) IWO is responsible for the development, construction, operation, and management of the Sprint PCS network in Vermont. (Paper 6 at 2.) Currently no PCS provider is providing wireless service in Charlotte. (Paper 1, exhibit C at 2; exhibit D at 2.) There are two cellular providers, Verizon and Cellular One, that offer service within Charlotte. (*Id.*)

There are two major types of technology used in providing personal wireless services—cellular technology and personal communications systems technology ("PCS"). Cellular technology is in turn broken down into two subsets: the older analog technology and the newer digital technology. *See* Stephanie E. Niehaus, Note, *Bridging the (Significant) Gap: To*

*What Extent Does the Telecommunications Act of 1996 Contemplate Seamless Service?*, 77 Notre Dame L.Rev. 641, 647–649 (2002). Cellular technology operates in the 800 MHz spectrum, while PCS operates in the 1900 MHz spectrum. (Paper 1, exhibit C at 3; exhibit D at 2.) In addition, PCS technology has the capability of offering a broader range of services to the user than does cellular technology, including wireless internet capabilities and enhanced 911 features. *See* Niehaus at 649.

Both cellular and PCS technology require that the user be within range of a telecommunications facility or cell site. "The geographic area covered by a particular cell site is called a cell, and a provider achieves seamless coverage throughout a greater area by constructing a grid-pattern of adjacent honey-comb shaped cells." *Sprint Spectrum, L.P. v. Willoth,* 176 F.3d 630, 634–635 (2d Cir.1999). Because PCS technology operates at a higher frequency than cellular service, the size of a PCS cell is smaller than that of a cellular service cell, and consequently PCS providers require a greater number of cells in order to provide seamless service. *Id.* at 635; Niehaus at 650–651.

### 3. *Substantial Evidence Standard*

"Any decision ... to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in the record." 47 U.S.C. § 332(c)(7)(B)(iii). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Elec. Contractors, Inc. v. NLRB,* 245 F.3d 109, 116 (2d. Cir.2001)(quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). In reviewing a denial by a zoning authority, the federal court "may neither engage in [its] own fact-finding nor supplant the Town Board's reasonable determinations." *Oyster Bay,* 166 F.3d at 494.

### 4. *Mandatory Injunction*

■ IWO is seeking a mandatory preliminary injunction. A party seeking a preliminary injunction "must establish that it will suffer irreparable harm in the absence of an injunction and demonstrate either (1) 'a likelihood of success on the merits' or (2) 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly' in the movant's favor." *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996) (citing *Waldman Publishing Corp. v. Landoll, Inc.,* 43 F.3d 775, 779–80 (2d Cir.1994); *Coca–Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 314–15 (2d Cir.1982)). In addition, "[t]he moving party must make a 'clear' or 'substantial' showing of likelihood of success [on the merits] where the injunction sought 'will alter, rather than maintain the status quo.'" *Id.* at 473 (citing *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33–34 (2d Cir. 1995)). If a plaintiff can meet this standard, injunctive relief is the appropriate remedy for a violation of the TCA. *Cellular Telephone Company v. Town of Oyster Bay,* 166 F.3d 490, 497 (2d Cir.1999).

### A. *Irreparable Harm*

■ IWO argues that, absent an injunction requiring Charlotte to grant it the permits it seeks while the current proceeding is ongoing, it will suffer irreparable harm in the form of lost subscribers, loss of the ability to compete for subscribers, loss of goodwill, and reputation damages. (Paper 4 at 11–14; Paper 5 at 12–14; Paper 6.) Charlotte counters that these damages are speculative at best, and do not satisfy the showing of irreparable harm required for a court to grant injunctive relief.

"Irreparable harm is an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'" *Tom Doherty Associates, Inc. v. Saban Entertainment Inc.*, 60 F.3d 27, 30 (2d Cir.1995)(quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)). The Second Circuit has held that loss of goodwill and potential loss of current and future customers can constitute irreparable harm. *Id.*

In addition, the Second Circuit and other courts that have addressed the issue have concluded that an injunction is the proper remedy for violations of the TCA. *See Cellular Telephone Company v. The Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir.1999). Courts that have explicitly addressed the irreparable harm issue have noted "[e]very day that Plaintiff's special permit is denied is a day Plaintiff loses against its major competitors ... [i]n today's quickly advancing world of telecommunications services, the costs of delay cannot be understated." *Telecorp Realty LLC v. The Town of Edgartown Planning Board*, 81 F.Supp.2d 257, 261 (D.Mass. 2000).

IWO has submitted affidavits from Michael Cusack, the Assistant Secretary and Associate General Counsel of IWO, and William Fitzsimmons, Ph.D., the managing director of an economic consulting firm, as evidence of irreparable harm. (Papers 5 & 6.) Dr. Fitzsimmons states that "IWO's inability to offer service through the Charlotte area over its own facilities restricts its ability to attract and retain customers." (Paper 5 at 12.) As Dr. Fitzsimmons points out, it is difficult to assess or quantify the harm experienced by IWO because of its failure to attract customers. (*Id.*) In addition, Dr. Fitzsimmons notes that, because IWO must rely on roaming to provide service in the Charlotte area, IWO's local customers (and Sprint's national customers traveling through the area) will experience both an increase in dropped calls and incremental roaming charges, causing harm to IWO's and Sprint's reputation. (*Id.*) Again, this harm is difficult to quantify. Finally, Dr. Fitzsimmons states that IWO will be harmed by delaying its ability to enter the telecommunications market in Charlotte and the surrounding areas. (*Id.*) Mr. Cusack similarly points to IWO's loss of ability to compete for customers, loss of revenue, loss of goodwill, loss of current customers, and injury to IWO's reputation as harms stemming from IWO's inability to provide seamless service in the Charlotte area, specifically in the 3–4 mile gap that IWO currently has in service along Route 7. (Paper 6.)

Charlotte argues that "the decisions of the Town have had no meaningful effect on the Plaintiff's ability to attract and retain customers, or to realize revenue." (Paper 15 at 18.) Charlotte offers no evidence to rebut IWO's statements or proffered affidavits, however. It is true that IWO has not offered anecdotal or empirical evidence to prove the harm they allege; it also appears true, as Charlotte alleges, that IWO's current customers do have some level of service in Charlotte. (*Id.*) Charlotte argues, in effect, that in order to show irreparable harm IWO must either quantify the amount of money it is losing because of its inability to provide seamless service in the Charlotte area, or have the names of customers who either dropped IWO's service or never signed up for it in the first place. This is not the case. As the Second Circuit has held:

> Where the availability of a product is essential to the life of the business or increases business of the plaintiff beyond sales of that product—for example, by attracting customers who make purchases of other goods while buying the product in question—the damages caused by loss of the product will be far

more difficult to quantify than where sales of one of many products is the sole loss. In such cases, injunctive relief is appropriate. This rule is necessary to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that damages must be based on more than speculation. *Tom Doherty,* 60 F.3d at 32. IWO has made a sufficient showing of irreparable harm here. It is impractical for IWO to offer its service to customers in and around Charlotte, because by relying on roaming to provide service IWO is unable to offer the other services that distinguish PCS service from cellular service. (Paper 6.)

### B. Success on the Merits

### I. Prohibition of Provision of Service

■ IWO first argues that Charlotte's denial of its applications prohibits or has the effect of prohibiting the provision of personal wireless service, in violation of the TCA. (Paper 4.)

The TCA preserves the authority of state and local governments "over decisions regarding the placement, construction, and modification of personal wireless service facilities" subject to some limitation. 47 U.S.C. § 332(c)(7). Under the TCA, "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof ... (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 42 U.S.C. § 332(c)(7)(B)(i)(II).

### a. Significant Gap

The Second Circuit has interpreted this provision as "preclud[ing] denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines." *Sprint Spectrum L.P. v. Willoth,* 176 F.3d 630, 643 (2d Cir.1999). "Where the holes in coverage are limited in number or size (such as the interiors of buildings in a sparsely populated area, or confined to a limited number of houses or spots as the area covered by buildings increases) the lack of coverage likely will be de minimis" and denying applications will not be a prohibition of service. *Id.* at 643–644. "[O]nce an area is sufficiently serviced by a wireless provider, the right to deny applications becomes broader: State and local governments may deny subsequent applications without violating subsection B(i)(II)." *Id.* at 643. "The right to deny applications will still be tempered by subsection B(i)(I), which prohibits unreasonable discrimination." *Id.*

Courts interpreting the *Willoth*[7] decision have differed in their determination of

7. In *Willoth,* Sprint challenged the denial of a permit it had sought to build three towers within the town. Sprint argued that the denial violated both 47 U.S.C. § 332(c)(7)(B)(i)(I), which prohibits unreasonable discrimination among providers of functionally equivalent services, and 47 U.S.C. § 332(c)(7)(B)(i)(II), the prohibition of services section. Sprint based its unreasonable discrimination claim on the fact that the town had allowed another company to build a tower in the industrial area of town that provided its customers with "in building" coverage. Sprint argued that preventing it from providing the same level of coverage would amount to unreasonable discrimination, despite the fact that Sprint wanted to build three towers in different areas of the town. *Willoth,* 176 F.3d at 638–639. The Second Circuit rejected this claim, holding that "local governments may reasonably take into account the location of the telecommunications tower into consideration when deciding whether: ... (2) to approve an application for construction of wireless telecommunications facilities, even though this may result in discrimination between providers of functionally equivalent services." *Id.* at 639.

what constitutes a "significant gap." Charlotte argues that the correct interpretation is to look at the gap from the customer's perspective, and that once coverage is available from one provider in an area, there is no gap. Indeed, several courts have interpreted the *Willoth* decision as holding that a gap must exist from the customer's, rather than the provider's perspective. *See e.g., Nextel W. Corp. v. Unity Twp.,* 282 F.3d 257, 265–266 (3rd Cir.2002); *APT Pittsburgh Ltd. Pshp. v. Penn Twp. Butler County,* 196 F.3d 469, 479–480 (3rd Cir.1999); *SiteTech Group, Ltd. v. Bd. of Zoning Appeals of Town of Brookhaven,* 140 F.Supp.2d 255, 259 (E.D.N.Y.2001). Other courts, however, have looked at the gap from the provider's perspective, or at least from a technology perspective. *See e.g., Second Generation Properties, LP v. Town of Pelham,* 313 F.3d 620 (1st Cir.2002); *Western PCS II Corp. v. Extraterritorial Zoning Authority,* 957 F.Supp. 1230 (D.N.M.1997)(finding effective prohibition when the only other provider in the area was an analog provider and applicant was a digital provider).

In the instant case, IWO presented evidence that there is currently a gap in the service it provides. The gap covers a significant part of the town of Charlotte, and runs along both Route 7 and the road to the Lake Champlain Ferry Dock. (Paper 6, exhibit 10.) This evidence was accepted as credible by the ZBA. (Paper 1, exhibit C at 4; exhibit D at 7.) The ZBA also accepted evidence presented by IWO that, based on a limited drive test, Verizon and Cellular One services both had gaps in their existing service and noted that these gaps were in the same areas that IWO sought to cover. (Paper 1, exhibit C at 3; exhibit D at 3.) Nevertheless, the ZBA took notice of their own experience with Cellular One and Verizon, noting "although there are certain locations, which are generally well known, where a signal may be lost or weak due to terrain/vegetation features ...

[t]hese areas are small in comparison to the areas of Town where coverage is now available." (*Id.* exhibit C at 4; exhibit D at 3.)

> Whether a "gap" constitutes a "significant gap" depends not only upon its physical size, but also, and perhaps more significantly, upon the number of customers affected by that gap. Since wireless services, unlike more traditional communications industries, are used while in transit, a gap that straddles a heavily traveled commuter thoroughfare would be more significant than a gap that affects a small residential cul-de-sac.

*Omnipoint Communs. MB Operations, LLC v. Town of Lincoln,* 107 F.Supp.2d 108, 119 (D.Mass.2000). In this case, IWO presented and the ZBA accepted evidence that there existed gaps both in IWO's service and in other providers' service and that these gaps ran along Route 7 and the Ferry Road leading to the ferry to New York. These gaps are "significant" for the purposes of the TCA.

#### b. *Single Provider Theory*

The Third Circuit has interpreted *Willoth* as instituting a two-prong test for any prohibition of services claim under the TCA. *See Nextel West Corp. v. Unity Township,* 282 F.3d 257 (3rd Cir.2002) and *APT Pittsburgh Ltd. Partnership v. Penn Township,* 196 F.3d 469 (3rd Cir.1999). Under the first prong, "the provider must show that its [proposed] facility will fill an existing significant gap in the service available to remote users." *Unity Township,* 282 F.3d at 265 (quoting *Penn Township,* 196 F.3d at 480). The Third Circuit defines the first prong as "requiring a gap from a user's perspective, rather than a particular provider's perspective. Thus this prong focuses on whether any provider is covering the gap, instead of whether the gap exists only in" one provider's ser-

vice. *Id.* The second prong of the test "requires the telecommunications plaintiff to show 'that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values the denial sought to serve.'" *Id.* at 266 (quoting *Penn Township,* 196 F.3d at 480). Permit denials are still subject to the prohibition on unreasonable discrimination under the TCA. *Id.* at 266 n. 10.

The First Circuit, on the other hand, has recently rejected this test and interpreted the *Willoth* decision differently. *See Second Generation Properties, LP v. Town of Pelham,* 313 F.3d 620 (1st Cir.2002). In *Second Generation,* the First Circuit interpreted *Willoth* as holding "that once a carrier has adequate (though less than perfect) service in an area, local boards can deny applications by that carrier for additional towers without violating the effective prohibition clause." *Id.* at 632 n. 13. The court reasoned that "[t]his reading is buttressed by the context in which the passage appears: the following two paragraphs explain that there is no effective prohibition because Sprint could provide adequate coverage with just one or two towers rather than the three towers it requested in its application." *Id.* The court goes on to note that "[t]he court's effective prohibition analysis [in *Willoth* ] does not discuss the provision of wireless services by other carriers." *Id.* Although the First Circuit ultimately upheld the denial of the permit in *Second Generation* on other grounds, it explicitly rejected the idea that "if any coverage is provided in the gap area by any carrier (including roaming service through a tower in a different town) then there can be no effective prohibition." *Id.*

Charlotte argues that the Third Circuit's test should be applied in this case, as it "is a logical extension of the *Willoth* analysis, and it effects a fair and reasonable balance of the interests of the service provider, the consuming public, and the municipal zoning authority." (Paper 15 at 28.) At first glance, the Second Circuit's interpretation does seem to look at the "prohibition of service" provision from a user's perspective, rather than from the provider's perspective, as Charlotte argues this Court should. In *Willoth,* however, the Second Circuit noted that reading the anti-prohibition provision of the TCA as applying only to general bans "would lead to the untenable result that once personal wireless services are available somewhere within the jurisdiction of a state or local government, either by virtue of a facility located outside or inside its borders, the state or local government could deny any further applications with impunity." *Willoth,* 176 F.3d at 641. Although attractively simple, such an interpretation is contrary to the TCA's intent to "encourage the rapid deployment of new telecommunications technologies." *Id.* (quoting *Reno v. American Civil Liberties Union,* 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)). In addition, as the First Circuit mentioned in *Second Generation,* in upholding the town's denial of Sprint's permit application, the *Willoth* court noted that the holes in Sprint's coverage could be remedied with fewer than the three towers the company had insisted upon, but made no reference to the fact that another provider did have coverage in the town or to the possibility that Sprint customers could simply roam off of the tower belonging to the other provider in the area. *Id.* at 643–644.

In this case, Charlotte argues that IWO's applications were denied because IWO failed to demonstrate need as required under § 9.7 of Charlotte's Zoning Bylaws. As Charlotte notes, "[IWO]'s evidence under § 9.7 focused almost exclusively on its own service coverage…Accordingly, the ZBA found that Plaintiffs had failed to comply with the requirements of § 9.7 because they did not demonstrate, among other things, that 'existing cover-

age is inadequate' (i.e. that significant gaps exist)." (Paper 15 at 24.) Specifically, the ZBA found that "[c]learly, one of the purposes of § 9.7 is to minimize the proliferation of telecommunications facility sites once adequate coverage has been provided within the Town. Given the coverage provided by Verizon and Cellular One, there is no significant gap that necessitates the provision of redundant service by IWO." (Paper 6, exhibit 14 at 8 (Crabbe decision); exhibit 13 at 9 (Knowles decision).) In other words, in order to comply with the zoning bylaws, IWO, or any other applicant must demonstrate that, not only that it does not have adequate coverage in the town, but that no wireless provider has adequate coverage in the town. If this is a permitted interpretation of § 9.7 under the TCA, Charlotte may deny all further permits for construction of wireless facilities, because Verizon does have adequate coverage in the town.

Charlotte argues that the TCA was intended to protect telecommunications service users rather than providers, and the fact that "most remote users" can reach the national network, either directly or by roaming, protects these users sufficiently. If Charlotte's interpretation of the TCA is correct, every town could deny new permits as soon as a single provider has established coverage. "The result would be a crazy patchwork quilt of intermittent coverage. That quilt might have the effect of driving the industry toward a single carrier" as users switch to carriers that have the most seamless coverage. *Second Generation*, 313 F.3d 620, 632. *See also New York SMSA Ltd. Partnership v. Town of Clarkstown*, 99 F.Supp.2d 381, 389 (S.D.N.Y.2000)("nothing in the TCA

guarantees any particular competitor that it have access to anything other than *the opportunity to provide service* ")(emphasis added); *Sprint Spectrum L.P. v. Town of Easton*, 982 F.Supp. 47, 52 n. 3 (D.Mass. 1997)(town denied a permit because "the requested use is not essential or desirable to the public welfare, in part because the technology is 'not dissimilar to existing cell telephones ...' This basis for denial, however, is in direct conflict with the mandate of the TCA as a pro-competitive vehicle in the marketplace of telecommunications.") (citations omitted). Rather than promoting competition, in other words, the TCA will have the effect of eliminating competition.

If the fact that a provider or providers have coverage in an area is sufficient reason to deny an application by a new provider, even if the provider's proposal is the least intrusive means by which it could fill the gap in its service, the existing companies will have a monopoly on the area and a disincentive to seek out new technological developments, subverting the purpose of the TCA. This is especially true in Charlotte, where the only current providers are providing only cellular technology as opposed to IWO's PCS technology.[8] Charlotte's denial of the permit based on § 9.7—when the ZBA "does not dispute IWO's statements regarding the quality of its direct coverage ...and (during the reopened proceedings) the coverage that *it* could purportedly obtain from collocating on existing telecommunications facilities" (Paper 6, exhibit 13 at 8; exhibit 14 at 7) but merely argues that IWO did not present sufficient evidence regarding the lack of coverage by any other provider—violates § 332(c)(7)(B)(i)(II).[9]

---

8. As already discussed, PCS technology has the capability of providing services beyond phone service, including wireless internet service and enhanced 911 service.

9. Charlotte makes much of the fact that its zoning bylaws permit cell towers in all zoning districts, so long as the applicant meets all of the specific standards set out in the Bylaws, including § 9.7. (Paper 15.) The fact that the Zoning Bylaws, on their face, do not prohibit

## II. *Unreasonable Discrimination*

IWO next argues that Charlotte's denial of its permit unreasonably discriminated against it, in violation of the TCA. (Paper 4.) Charlotte counters, however, that the decision did not discriminate, and if it did, the discrimination was not unreasonable.

Under the TCA, State and local government decisions regulating "the placement, construction, and modification of personal wireless service facilities ...(I) shall not unreasonably discriminate among providers of functionally equivalent services ...." 47 U.S.C. § 332(c)(7)(B)(I). The TCA does not prohibit all discrimination among providers of functionally equivalent services, but any discrimination must be reasonable. *Willoth,* 176 F.3d at 638–639.

By prohibiting unreasonable discrimination, the TCA allows local governments "to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services." H.R. Conf. No. 104–458, at 208.

■ Charlotte concludes that it did not discriminate against IWO, because Verizon and Cellular One have never applied for variances and therefore it has never "treated" the two entities in any way. Charlotte concludes, therefore, that it cannot be discriminating among similarly situated applicants. Decisions which have the effect of discrimination can still violate the TCA, even without any wrongful intent on Charlotte's part, however. *See Sprint Spectrum v. Town of Easton,* 982 F.Supp. 47, 51 n. 2 (D.Mass.1997)("Defendant erroneously states that it has not discriminated against Plaintiff, because ... Defendant has no discriminatory intent. But the Board's intent is irrelevant. It is the discriminatory effect of the Board's application of the By–Laws and the basis upon which it denied Plaintiff's request for a special permit that are controlling.").

■ As Charlotte notes, the Second Circuit has stated that "it is not unreasonably discriminatory to deny a subsequent application for a cell site that is substantially more intrusive than existing cells by virtue of its placement, structure or cumulative impact." *Willoth,* 176 F.3d at 642. *Charlotte did not deny these applications on one of these bases, however.* Instead, Charlotte found that, even though IWO's application met all the substantive requirements for a permit (aesthetics, safety, etc.), IWO had failed to demonstrate a need for their facilities. IWO presented evidence that it had no facilities in the area and that, although its users could still make some calls through roaming, other services that normally would be provided would not be available. Charlotte did not,

---

the provision of personal wireless service is not the issue, however. "Construing subsection B(i)(II) to apply only to general bans would lead to the conclusion that, in the absence of an explicit anti-tower policy, a court would have to wait for a series of denied applications before it could step in and force a local government to end its illegal boycott of personal wireless services." *Willoth,* 176 F.3d at 640. In reality, however, Charlotte has instituted a general ban against any further development of personal wireless service technology. *See Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals,* 297 F.3d 14, 23 (1st Cir.2002)("Setting out criteria under the zoning law that no one could ever meet is an example of an effective prohibition.") The ZBA has interpreted § 9.7 as requiring any applicant to provide evidence that there is no adequate coverage by any provider in Charlotte and that this applicant proposes to bring service to that particular area. The ZBA has also determined that adequate coverage exists in Charlotte, because Verizon and Cellular One provide coverage, and if its interpretation is allowed to stand, it will be able to deny applications for additional service by other providers or even updated service by the current providers with impunity. (Paper 1, exhibits C and D.)

in fact, deny the application because of the cumulative impact of antennas or towers, but on the perception that there was already enough cell phone service in the area. In so doing, they effectively favored the two existing providers over IWO. *See Town of Easton,* 982 F.Supp. at 51 (noting that, when a permit denial was based on the fact that wireless service was already available in the town, the Board "favors existing providers, sheltering them from the very competition Congress sought to create when it enacted the TCA."). As the goal of the TCA is to promote competition, the mere fact that wireless service exists in an area, without a finding of actual cumulative impact or other shortcoming, can not be a reasonable basis upon which to discriminate.

### III. *Substantial Evidence*

Charlotte also asserts that IWO's applications were denied because IWO failed to meet its burden to prove need under § 9.7. Charlotte argues both that IWO failed to present adequate evidence as to its own need for the facilities and as to the need of the general public.

■ Charlotte first argues that IWO failed to present adequate evidence of the general public's need for the antennas. As already discussed, Charlotte's denial of IWO's applications was in violation of the TCA's anti-prohibition clause. Even if the denials did not violate this clause, however, they are not supported by substantial evidence in the record. As already discussed, IWO presented and the ZBA accepted evidence that there existed gaps both in IWO's service and in other providers' service, and that these gaps were located along major roads. IWO submitted maps indicating the coverage that would be provided by the antenna, and the coverage areas included the gaps in other providers' services. (Paper 6, exhibit 3 and 4.) Nevertheless, the ZBA held that IWO had not

produced adequate evidence of need, based solely on the members' personal experience with Verizon and Cellular One. (Paper 1, exhibit C at 3; exhibit D at 3.) Specifically, the ZBA noted that:

> Several ZBA members have extensive personal experience with the use of Verizon and/or Cellular One service within the Town. The ZBA takes notice of this experience. On the whole, the Board observes that wireless coverage exists in the Town of Charlotte, although there are certain locations, which are generally well known, where a signal may be lost due to terrain/vegetation features. These locations include ... the area just North of the Ferry Road. These areas are small in comparison to the areas of Town where coverage is now available.

(*Id.*) Personal knowledge of a few ZBA members, not supported by any evidence in the record, and in fact rebutted by evidence presented by IWO and accepted by the ZBA can not constitute substantial evidence.

In addition, Charlotte argues that IWO failed to provide adequate evidence as to why the indirect service it could provide through roaming was not adequate. The Second Circuit has not yet stated whether the ability of a provider to provide service solely through roaming technology is sufficient to combat a prohibition of services claim. Even if the ability to provide service through roaming is enough, however, there was not substantial evidence to support a determination that IWO could fill its gap in service through roaming technology. In its decision, the ZBA stated that "[n]ot all wireless phones allow roaming, but most do, including phones available to IWO customers." (Paper 6, exhibit 13 at 3 n. 3; exhibit 14 at 4 n. 3.) This statement does not appear to be supported by any evidence in the record; in fact, according to the statement by Will Simonelli present-

ed to the ZBA, "IWO currently provides poor coverage in the town of Charlotte. The area where coverage is provided is extremely limited and the service is not reliable." (Paper 6, exhibit 12.) In addition, although this does not appear in the record currently before the Court, IWO states that evidence was presented to the ZBA that many phones used by IWO customers do not allow roaming on the Verizon or Cellular One networks, the only services available in Charlotte. (Paper 19 at 16.) The possibility of roaming does not appear to have been brought up in any substantial measure by the ZBA during the proceedings. It appears then, that there is not substantial evidence to support the ZBA's finding that IWO's customers could be serviced through roaming.

Finally, Charlotte argues that IWO failed to provide sufficient evidence regarding the possibility of co-location on an existing tower outside the Town. IWO's application indicates that the effective range of a PCS antenna is only five miles, and it submitted evidence regarding the towers it owned within fourteen miles of Charlotte. (Paper 6, exhibit 8 & 9.) IWO also evaluated the possibility of co-locating on each of the towers in the Charlotte area and provided reasons and documentation for the rejection of each. (Paper 6, exhibit 12.) These reasons include local controversy regarding one site, technology issues, and lack of coverage provided. (*Id.*) The ZBA's decisions note that "IWO did not produce evidence regarding what modifications, if any, to the transmit facilities or sites, noted above, may be possible to enhance the coverage it seeks to provide." (Paper 1, exhibit C at 3; exhibit D at 3.) As with the reliance on roaming, there does not appear to be any evidence in the record that modifications would enhance IWO's coverage from the existing towers; there is substantial evidence in the record that IWO could not provide the coverage it seeks by co-locating on an existing tower.

## Conclusion

IWO has made a clear showing of irreparable harm and a clear showing of substantial likelihood of success on the merits. Specifically, this Court finds that:

1. IWO's applications showed that there is no seamless coverage in the town of Charlotte by any wireless service provider. More importantly, IWO does not have seamless coverage in the town.

2. The proposed antennas are the least intrusive means for filling the gap in service. As the ZBA found, the applications met every single general and specific requirement for a conditional use permit under the Charlotte Zoning Bylaws, as well as the requirements that relate specifically to telecommunications facilities in §§ 9.6.1 and 9.8.

3. Charlotte's denial of the applications based on the decision that adequate wireless service exists in the Town violates § 332(7)(B)(i)(II), which prevents local zoning authorities from making decisions that prohibit or have the effect of prohibiting the provision of personal wireless service. In so finding, this Court rejects the so-called "single provider theory" advanced in several Third Circuit cases.

4. Charlotte's decision that no other wireless service is needed in the town unreasonably discriminates against IWO, because the decision is not based on the visual, aesthetic or safety concerns of the antennas. In addition, the decision unreasonably favors older cellular technology over PCS technology.

5. Charlotte's decision that IWO could have provided adequate service through roaming is not supported by substantial evidence. In addition, the ZBA's use of several Board members' personal knowledge of cellular phone service in the area is not sufficient to rebut the evidence pre-

sented by IWO showing a gap in the existing wireless service coverage in Charlotte.

6. If the preliminary injunction is not issued, IWO will suffer unquantifiable and irreparable harm in the form of lost subscribers, loss of the ability to compete for subscribers, loss of goodwill, and damage to its reputation.

For all of the above stated reasons, IWO's Motion for a Preliminary Injunction is GRANTED, and Charlotte is ordered to issue all permits necessary for the construction and maintenance of the antennas at the Crabbe and Knowles sites. IWO shall post security in the amount of $50,000 for the cost of the removal of the antennas and related facilities if the injunction is subsequently dissolved. Fed.R.Civ.P. 65(c).

In accordance with the TCA's mandate that actions challenging the decisions of local governments be dealt with in an expedited manner, all motions for Summary Judgment shall be submitted by January 31, 2003.