OMNIPOINT COMMUNICATIONS, INC. and, Omnipoint Facilities Network 2, LLC, Plaintiffs,

v.

The VILLAGE OF TARRYTOWN PLANNING BOARD, Chairman Stanley Friedlander, Bruce Carlino, Annette Fago, Henry Rissmeyer, Ron Tedesco and Zubeen Shroff, Constituting the past and present Planning Board, and Richard Fon, Building Inspector, Defendants.

No. 03 CIV. 6344(CM).

United States District Court, S.D. New York.

Jan. 16, 2004.

Michael W. Peters, Leboeuf, Lamb, Greene & MacRae, Albany, NY, for Plaintiffs.

Darius Patrick Chafizadeh, Kevin J. Plunkett, Thacher, Proffitt & Wood, Karen A. Jockimo, Boeggeman, George, Hodges & Corde, P.C., Richard G. Corde, Boeggeman, George, Jannace & Hodges, P.C., White Plains, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

McMAHON, District Judge.

Omnipoint Communications, as agent for Omnipoint Facilities Network 2, LLC ("Omnipoint") seeks preliminary and permanent injunctive relief enjoining the Village of Tarrytown Planning Board ("Planning Board") from withholding permits and approvals for the installation and operation of a Wireless Telecommunications Service Facility ("WTSF") in the Village of Tarrytown ("Tarrytown"). Omnipoint alleges that the Planning Board's denial of Omnipoint's application was unsupported by substantial evidence, in violation of the Telecommunications Act of 1996 ("TCA" or the "Act"). Omnipoint's motion (which I am treating as a motion for summary judgment on Plaintiff's Third Cause of Action) is granted.[1]

### FACTS

The following facts are undisputed. All are derived from the administrative record in the case.

*The Planning Board Application*

On September 3, 2002, Omnipoint filed an application for site plan approval of the WSTF in accordance with the Village of Tarrytown's then-existing zoning ordinance governing wireless communications ordinance governing such facilities (the "Application"). (Affidavit of Michael Peters, dated October 3, 2003 ¶ 9.) The WSTF Omnipoint proposed to install and operate (the "Facility") consisted of six panel antennas, one small GPS antenna,

---

1. The parties were so advised by letter on January 13, 2004, and were given an opportunity to identify disputed issues of material fact.

three equipment cabinets and associated equipment. (*Id.* ¶ 5.) The antennas would be flush-mounted to the exterior of an existing six-story building located at 19 South Broadway in the Village of Tarrytown, New York. The antennas would be painted to match the exterior of the building. (*Id.*)

Nextel, a competitor of Omnipoint, already has a WTSF located at 19 South Broadway. Nextel's facility has eleven panel antennas flush-mounted to the exterior of the building. (Peters Aff. ¶¶ 6, 96–97.) In addition, 19 South Broadway is not located in a residential district under the Village Zoning Code. (*Id.* ¶ 8.)

The Application provided information regarding the need for Omnipoint's proposed WTSF due to existing coverage gaps, analyzed the local environmental and health impacts of the Facility and its compliance with the existing Zoning Code and requested a waiver of the Zoning Code's setback requirement. (Oct. 3 Peters Aff. ¶¶ 10–18).

*The Application Review*

On September 30, 2002, Omnipoint appeared before the Planning Board and provided a presentation on the Application. The Planning Board scheduled a public hearing on Omnipoint's application for October 28, 2002, and agreed that the Planning Board would hire a consultant to review the coverage aspect, alternative sites and reports submitted. (Oct. 3 Peters Aff. ¶ 20 Exh. 3, Planning Board Meeting Minutes.)

On October 28, 2002, Omnipoint appeared at the public hearing and presented testimony and information with which it purported to demonstrate (1) the significant gap in coverage, (2) the reasons for the selection of the proposed site, (3) the facility's compliance with electromagnetic exposure guidelines; and (4) that the proposed facility did not present a significant adverse environmental impact. (Oct. 3 Peters Aff. ¶ 21.) The Planning Board refused to vote on Omnipoint's application. Instead, one of the Planning Board members questioned whether Omnipoint "had looked at other building such as office buildings," and the Chairman of the Board requested that Omnipoint "submit a listing of the alternative sites that were reviewed." (Affidavit of Ron Tedesco, dated October 17, 2003 ¶ 30 Exh. C.)

In a letter dated October 29, 2002, Jeffrey S. Shumejda, Tarrytown's attorney, identified seven alternative sites for Omnipoint to address. (Oct. 3 Peters Aff. Exh. 6.)

Pursuant to the Planning Board's request, Omnipoint's radio frequency expert conducted an engineering analysis of the seven alternative locations to determine whether they would fill the coverage gap at issue. On November 22, 2002, Omnipoint filed with the Planning Board a supplemental radio frequency engineering report addressing all seven alternative sites selected by the Planning Board and explaining why it believed that none of the seven alternative sites would cover the gap in service. (Oct. 3 Peters Aff. Exh. 6.)

On November 25, 2002, Omnipoint appeared before the Planning Board for the continued public hearing. At the start of the meeting, the Planning Board's attorney handed to an Omnipoint representative a copy of the recently enacted Wireless Telecommunications Services Facilities Law of the Village of Tarrytown, Local Law 8–2002 ("Wireless Zoning Code") and advised Omnipoint that it had to comply with this newly enacted law in order to move Omnipoint's application forward. (Oct. 3 Peters Aff. ¶ 26.)

During the hearing, Omnipoint's radio frequency expert testified at length about

the radio frequency aspect of the Facility and as to why each of the seven alternative sites would not cover the service gap. (Affidavit of Michael Littman, dated October 3, 2003 ¶ 10.) He also explained that an additional site was investigated by Omnipoint that would have provided coverage, but ruled it out because the landlord was not interested in leasing the property. (Id.¶ 32.)

Following this testimony, the Planning Board suggested that Omnipoint redesign the proposed Facility (*i.e.* add antennas to the proposed facility) to cover areas in Tarrytown to the west of the Property. (Oct. 3 Peters Aff. ¶¶ 33–34.) The Planning Board's consultant, Cerami & Associates, stated "a typical site has three sectors and it seems there should have been one to the west to cover that gap." (*Id.*) Omnipoint agreed to conduct this examination. As a result of the Planning Board's request that Omnipoint redesign the Facility to provide added coverage, to increase coverage to the West of the site and to comply with the new Wireless Zoning Code, which required extensive additional documentation, the continued public hearing was adjourned. (Oct. 3 Peters Aff. ¶¶ 37–38.)

Omnipoint conducted the requested examination and determined that a redesign of the proposed Facility was feasible to accommodate the Planning Board's request. In addition to the supplemental materials necessary to comply with the new Wireless Ordinance, the redesign required new engineering and site plans and an additional radio frequency analysis and report. (Oct. 3 Peters Aff. ¶ 36.) On March 14, 2003, Omnipoint filed its revised application with the Planning Board ("Amended Application"). (*Id.* ¶ 39.) The Amended Application modified the facility design and incorporated an additional sector of antennas to add coverage to the west of the Property as requested by the Planning Board. The Amended Application again identified the significant gap in service and explained how the revised Facility would fill the gap. (*Id.* ¶¶ 40–47.)

On March 31, 2003, Omnipoint appeared before the Planning Board for the third continued public hearing on its application. Although the Planning Board lacked a quorum and could take no action on Omnipoint's application at that time, Allee King Rosen & Fleming ("AKRF"), the Planning Board's consultant, advised the Planning Board that they "deemed that the new application substantially complies with the special use regulations, and that there would be no significant adverse environmental impacts."[2] (Oct. 3 Peters Aff. ¶ 49 and Exh. 13.) Further, they recommended "at the next Planning Board that a negative declaration be issued along with a special permit and site plan approval." (Oct. 3 Peters Aff. ¶ 49.)

2. AKRF's four page, single spaced letter to the Planning Board, dated March 27, 2003, provided a lengthy analysis of the Amended Application and found, among other conclusions, that "the applicant substantially complies with the standards for the special permit and has demonstrated that there will be no significant adverse environmental impact as a result of the proposed facility." Of note, the letter also found that the proposed application "is not located within a designated historic district," "will not create any visual or aesthetic impact that will have a measurable effect on any adjoining properties," that the existing Nextel antennas "have not had any demonstrated effect on adjoining properties," and that the Facility "will not materially alter or interfere with existing views to or from the Hudson River or surrounding areas." Accordingly, the letter recommended that the "Planning Board waive the requirement for a 'fall zone' setback as the proposed facility appropriately minimizes visual impacts of the project." (Oct. 3 Peters Aff., Exh. 14, Letter from AKRF to Planning Board, dated March 28, 2003.)

On March 27, 2003, Cerami & Associates issued a report regarding propagation studies and other technical studies (the "Cerami Report"). The Cerami Report suggested the Planning Board request additional information regarding Omnipoint's 911 system, the Bell Laboratories Report, and the Radio Frequency report. Notably, the Cerami Report stated "mounting antenna on the facade or at the rooftop perimeter of building is generally considered good practice for minimizing potential radio frequency radiation hazards to people having access to the roof.... As long as aesthetic and structural issues are adequately addressed, the Board should consider waiving the setback requirement." (Oct. 3 Peters Aff. ¶ 56.)

On April 14, 2003, Omnipoint provided all of the additional information requested by Cerami & Associates in its report. Omnipoint also responded to various arguments that had been raised by residents opposed to the Facility. (Oct. 3 Peters Aff. ¶¶ 58–59.)

On April 15, 2003, Omnipoint appeared before the Planning Board for the fourth continued public hearing on its application. At that time, Omnipoint addressed all items raised in the Cerami Report and by residents opposed to the project. (Oct. 3 Peters Aff. ¶ 60; Littman Aff. ¶ 14.) Omnipoint also presented the Planning Board with a copy of a "No Effect" letter from the New York State Office of Parks, Recreation and Historic Preservation relating to the Facility. (Oct. 3 Peters Aff. ¶ 61.)

The Planning Board again refused Omnipoint's request that it close the public hearing and vote on its application. Rath-

er, the Planning Board suggested Omnipoint evaluate additional alternative sites, three nearby churches, that were identified, for the first time, at the meeting. (Oct. 3 Peters Aff. ¶ 64.) The three churches were (1) the Reformed Church of the Tarrytowns at 42 North Broadway; (2) the First Baptist Church at 56 South Broadway; and (3) the Christ Episcopal Church at 43 South Broadway. (Tedesco Aff. Exh. C.) Omnipoint's expert explained at the April 15, 2003 public hearing, that the new alternatives identified by the Planning Board would not be acceptable due to interference from taller buildings, including blockage from 19 South Broadway. (Littman Aff. ¶ 14.)[3]

On April 17, 2003, the Planning Board's expert, Cerami & Associates, issued a letter stating that Omnipoint had adequately addressed all of their previous comments and requests for additional information. (Oct. 3 Peters Aff. ¶ 67.) Cerami & Associates also recommended the Planning Board grant Omnipoint's waiver of the setback requirement to enable the antenna to be flush-mounted on the exterior of the building. (Id.) On May 9, 2003, Cerami & Associates also sent a letter to the Planning Board stating that they had no additional comments based on minutes from the April Planning Board meeting. (Id. ¶ 68.) The letter repeated the finding in the Cerami & Associates April 17 letter that "the technical issues previously raised by us had, in our opinion, been satisfactorily addressed." (Id.)

On May 13, 2003, AKRF submitted a letter to the Planning Board stating that they agreed with Omnipoint's analysis that

---

3. Some Board Members also stated their disapproval with the additional sites identified by the Planning Board. One Board Member specifically stated, "I would think if you start putting the antenna on the steeple, for example, of the Baptist Church ... I have to be-

lieve people will be outraged." Another Board Member questioned the appropriateness of the churches as a site given their perceived historic nature. Chairman Friedlander acknowledged these were good points. (Oct. 3 Peters Aff. ¶¶ 65–66.)

no impermissible segmentation under the State Environmental Quality Review Act ("SEQRA") existed in reference to the proposed facility. (Oct. 3 Peters Aff. ¶ 70.) AKRF's letter also stated, "the applicant has adequately demonstrated that there will be no significant adverse environmental impacts as a result of the proposed [wireless facility]" and that "[t]he only potential effect would be a change in the visual character namely the effect of adding a new WTSF to a rooftop where WTSF are currently located." (*Id.* ¶ 71.) AKRF concluded that, "the applicant has demonstrated that this potential effect would not be significant or adverse." (*Id.*) AKRF's letter also found "[u]nder SEQRA, alternatives are considered when a proposal has the potential to generate significant adverse environmental impacts[,]" and that an environmental impact statement, which would include an explanation of alternatives, was not necessary. (*Id.* ¶ 72.)

On May 13, 2003, Omnipoint appeared before the Planning Board for the fifth continued public hearing on its application. At that time, Omnipoint again presented evidence that the additional alternatives— the three churches—would not work to satisfy the identified significant gap in coverage because of the structural and radio frequency blockage issues. (Oct. 3 Peters Aff. ¶ 73; Littman Aff. ¶ 14.) Omnipoint's expert testified regarding the limitations of site selection due to terrain in the Village. (Littman Aff. ¶ 17.)

In addition to Omnipoint's expert testimony at the April and May hearings, Omnipoint also submitted an affidavit at the May hearing explaining why each site was not a feasible alternative due to structural and technical problems and, with respect to the Christ Episcopal Church, because of radio frequency blockage caused by nearby taller buildings (specifically, 19 South Broadway). (Oct. 3 Peters Aff. ¶¶ 73–74 and Exh. 25; Littman Aff. ¶¶ 14, 25.) The affidavit also explained how the proposed site was chosen and described another alternative reviewed at the outset of Omnipoint's site selection process but rejected because a lease could not be obtained from the landowner. (Oct. 3 Peters Aff. ¶ 75.) Following Omnipoint's presentation, the Planning Board stated that their consultants believed the application met the requirements. (*Id.* ¶ 76.)

The Planning Board again refused Omnipoint's request that it close the public hearing and act on its application. Instead, the Planning Board raised five items they wanted fully addressed by their attorney and Cerami & Associates.[4] (*Id.* ¶ 77.)

In response to Omnipoint's objections to yet another adjournment, the Planning Board admitted that Omnipoint met the legal requirements under the Village's Wireless Ordinance and that the application had been delayed. Specifically, addressing the five items that the Planning

---

**4.** The five items included: 1) all items raised in a letter by an opponent of the project, which was submitted to the Planning Board with no prior notice to Omnipoint (all of the items raised were previously addressed by Omnipoint); 2) near-field analysis (a report from Omnipoint's expert previously explained a near-field analysis was not necessary for this site and the Planning Board's expert was satisfied with the response); 3) segmentation (already addressed by Omnipoint in legal arguments in letters to and presentations before the Planning Board); 4) priority listing (already addressed by Omnipoint in letters to and presentations before the Planning Board); and 5) setback requirement (previously explained by Omnipoint's expert and the Planning Board's expert, Cerami & Associates, found Omnipoint adequately addressed this issue). Omnipoint responded to each of these five issues in a June 11, 2003 letter to the Planning Board (Oct. 3 Peters Aff. ¶ 79), and in a June 18, 2003 affidavit from a radio frequency engineer. (*Id.* ¶ 80.)

Board wanted Omnipoint to address yet again, Mr. Tedesco, the Acting Chairperson for the hearing, stated that "I would like to have these items finally addressed, and then I'm going to make a motion on this thing. Because legally, the applicant has come a long way and *has met all the legal requirements* ... And I think we owe it to the applicant to say this is really the final stuff we want attended to and come to some closure on this." (Oct. 3 Peters Aff. ¶ 78.) (Emphasis added.) The other Board members agreed that these were the only remaining items to address. (*Id.*, Exh. 26 at 85.)

On June 23, 2003, Omnipoint appeared before the Planning Board for the sixth continued public hearing on its application. At that time, Omnipoint again went through the five items identified by the Planning Board at the previous public hearing and discussed the affidavit regarding the design and placement of the antenna. (Oct. 3 Peters Aff. ¶ 81.)

The Planning Board continued to refuse to close the public hearing and vote on Omnipoint's application. Instead, the Planning Board brought up additional issues for Omnipoint to address. Specifically, the Planning Board stated that it now wanted its own radio frequency consultant, Cerami & Associates, to conduct a radio frequency "near-field analysis."[5] (Oct. 3 Peters Aff. ¶ 82.) The Planning Board also requested that Cerami & Associates reexamine the seven alternative locations that the Planning Board had identified and to which Omnipoint had previously responded. (*Id.* ¶ 83.) Town counsel Jeffrey Shumejda also noted that Omnipoint had a similar application pending at 28 Beekman Avenue in Sleepy Hollow. (Tedesco Aff. Exh. C).

On July 28, 2003, the day of the seventh continued public hearing, almost eleven months after Omnipoint filed its application and ten months after first appearing before the Planning Board, the Planning Board's consultant, Cerami & Associates, provided Omnipoint with a Near–Field and Far–Field Electromagnetic Exposure Evaluation, dated July 21, 2003 (one week earlier), and an Evaluation of Alternative Sites Report, dated July 24, 2003 (several days earlier). The Near–Field and Far–Field Electromagnetic Exposure Evaluation concluded that "the Omnipoint installation, as proposed would be in compliance with FCC electromagnetic exposure guidelines," thus confirming the conclusions of Omnipoint's expert reports submitted to the Planning Board three months ago. (Oct. 3 Peters Aff. ¶ 85 and Exh. 29.)

The Alternative Sites Report concluded that five of the seven alternatives would not provide coverage, as stated by Omnipoint, but that the Planning Board may want Omnipoint to further address alternative sites 6 and 7. (Oct. 3 Peters Aff. ¶ 86 and Exh. 30; Littman Aff. ¶ 22.) The Alternative Sites Report also acknowledged that there may be factors, including the presence of excessive amounts of frequency interference, frequency coordination issues within Omnipoint's frequency blocks, unavailability of the site and structural issues related to the mounting of the antenna and base station equipment on the existing structures, that would affect the suitability alternative sites 6 and 7. (Littman Aff. ¶ 22.) Likewise, the Alternative Sites Report states "such locations may not be optimal even if the desired signal strength can be achieved within the gap area." (Oct. 3 Peters Aff. ¶ 86; Littman Aff. ¶ 22.) At the seventh continued public

---

**5.** Omnipoint submitted a report from its expert, Bell Labs, months before stating that a near-field analysis was unnecessary for this specific site and the Planning Board's expert, Cerami & Associates, previously found that Omnipoint had adequately address the issue.

hearing, Omnipoint's radio frequency expert testified as to specific factors, not taken into account by Cerami & Associates, that prevented Alternatives 6 and 7 from covering the identified gap in service. (Littman Aff. ¶ 23.)

The Planning Board came up with an additional alternative location for Omnipoint to investigate—Losee Park (Oct. 3 Peters Aff. ¶ 88.)[6] Despite the fact that Omnipoint's expert testified as to the specific factors not taken into account by the Planning Board's expert, the Planning Board asked its expert to evaluate Losee Park and Christ Espiscopal Church. (Oct. 3 Peters Aff. ¶¶ 87–90; Littman Aff. ¶¶ 23–25.) The Planning Board again refused to close the public hearing and vote on Omnipoint's application.

*Omnipoint Commences The Instant Action*

Omnipoint commenced the instant action on August 22, 2003. Omnipoint's counsel called Defendants' attorney and the Village Attorney to inform them of the commencement of the action on August 25, 2003, and of the fact that United States District Judge Pauley had signed an Order To Show Cause relating to the action.[7] Plaintiff's complaint, amended as of September 24, 2003, alleged eight causes of action including four seeking declaratory judgments that Defendants are in violation of Section 704 of the TCA, due to (1) Defendants' failure to take action on Omnipoint's application within a reasonable period of time; (2) Defendants' de facto denial of Omnipoint's application by Defendants' failure to take action on Omnipoint's

application within a reasonable period of time, in that said denial was not in writing and based on substantial evidence in the written record; (3) Defendants' denial of Omnipoint's application at the public hearing on August 25, 2003, in that said denial was not based on substantial evidence in the written record; and (4) Defendants' unreasonable discrimination among providers of functionally equivalent services; a fifth cause of action declaring that Defendants have deprived Plaintiff of its rights under 42 U.S.C. § 1983; a six cause of action declaring that Defendants are in violation of Article 78 of the New York State CPLR; a seventh cause of action granting Omnipoint a preliminary and permanent injunction directing Defendants to issue any and all approvals necessary for installation of the Facility; and an eighth cause of action awarding Omnipoint actual and compensatory damages, as well as attorney's fees.

At the August 25, 2003 public hearing, the Planning Board read into the record a supplemental report by Cerami & Associates and a letter, dated August 25, 2003, from the Michael McGarvey, the Village's Consulting Engineer, to Counsel Shumejda relating to Mr. McGarvey's inspection of the Christ Church site. The Ceramin & Associates report stated, "site 8 (Christ Church, 43 South Broadway) is located within the search ring and appears to be a viable alternative to the subject site." (Tedesco Aff. Exh. C.) While the report addressed both the installation of the antennas and the space for Omnipoint's

---

**6.** Omnipoint's expert explained, at the July 28 public hearing, that the same elevation issues and interference from buildings and trees that affected Alternatives 6 and 7 would also make Losee Park an infeasible alternative to 19 South Broadway. (Littman Aff. ¶ 24.)

**7.** Omnipoint also brought a motion for Order To Show Cause seeking preliminary and permanent injunctive relief based on the unreasonable delay by the Planning Board. On September 15, 2003, the Court determined that this motion was mooted by the Planning Board's subsequent vote to deny the application.

equipment cabinets, it also stated, "there may be factors that we are unaware of that would affect the suitability of" the Christ Church site, including "the presence of excessive amounts of radio frequency interference ... unavailability of the site and structural issues relating to the mounting of antennas and base station equipment on existing structures." (*Id.*) The letter from the Engineer concluded, "I found the structural steel [of the Christ Church bell tower] to be in good condition ... and see no reason why an Omnipoint six panel antenna with one small GPS antenna cannot be mounted at this tower, with all pertinent equipment and cabinets located in the basement." (*Id.*)

After informing Omnipoint that it would approve the installation of a WTSF at the Christ Church site located at 43 South Broadway, the Planning Board read a prepared resolution (the "Resolution") into the record that denied the Omnipoint's 19 South Broadway application for multiple reasons. The Board also issued a positive declaration on the State Environmental Quality Review Act.

On October 3, 2003, Plaintiff filed the instant motion.

## DISCUSSION

### I. Standard of Review

Under Fed.R.Civ.P. 56(c), a party is entitled to summary judgment if the moving party establishes that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. "[T]he moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). The court will "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor ... and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotations omitted).

### II. The Telecommunications Act of 1996

■■■ Section 332(c)(7)(B)(iii) of the Act states that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332. In applying this standard, federal courts "apply the traditional standard used for judicial review of agency actions in its determination of whether the denial was supported by substantial evidence." *Omnipoint Communications, Inc. v. City of White Plains,* 175 F.Supp.2d 697, 711 (S.D.N.Y.2001). However, "denials subject to the TCA are reviewed by this court more closely than standard local zoning decisions." *Id.* at 710–11 (quoting *Town of Oyster Bay,* 166 F.3d at 493). Under New York law, "cellular telephone companies, such as Omnipoint, are classified as 'public utilities' for purpose of zoning applications" and, as such, "[a] zoning board of appeals has a narrower range of discretion in dealing with special permit applications filed by utilities than is true in the case of the generality of applications." *Omnipoint Communications, Inc. v. Common Council of the City of Peekskill,* 202 F.Supp.2d 210, 222 (S.D.N.Y.2002) (citing, *e.g., Cellular Tel. Co. v. Rosenberg,* 82 N.Y.2d 364, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993)).

In reviewing a local zoning board denial of a wireless facility application, the court "must overturn the board's decision under the substantial evidence test if it cannot conscientiously find that the evidence supporting the decision is substantial, when viewed in the light the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *City of White Plains,* 175 F.Supp.2d at 711. Where the review of the record demonstrates that the denial was not based upon substantial evidence, the court will not hesitate to direct the issuance of all necessary permits. *See Omnipoint Communications, Inc. v. Common Council of the City of Peekskill,* 202 F.Supp.2d 210, 227 (S.D.N.Y.2002) (finding that appropriate remedy for violation of the TCA is "immediate injunctive relief directing the issuance of a special permit, building permit and any other applicable permits or approvals necessary for Omnipoint to construct and operate its personal wireless service facility").

The "substantial evidence" standard has been described as "less than a preponderance, but more than a scintilla of evidence. 'It means such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Id.* at 221 (quoting *Universal Camera v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). The unsubstantiated concerns of the general public do not constitute substantial evidence. *See id.* at 223.

Omnipoint's sole claim in the instant matter is that the Planning Board's decision to deny Omnipoint's application at the August 25, 2002 hearing was not supported by substantial evidence in violation of the subsection (7)(b)(iii) of the TCA. Tarrytown responds that it was compelled to deny the application because it violated various local zoning laws.

Construing all the facts most favorably to the Planning Board, I find that Omnipoint is correct.

## A. Coverage Gap

The first rationale offered by the Planning Board for denying Omnipoint's application was that Omnipoint failed to demonstrate that it had a significant gap in coverage that would be filled by the Facility and failed to offer less intrusive alternatives.[8] Under the TCA, state and local government regulations "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 42 U.S.C. § 332(c)(7)(B)(i)(II).[9] The Second Circuit has held that this provision "precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to

8. Resolution item [c] states that,

 the Planning Board has authority to evaluate (1) whether there is a legally-cognizable significant gap in coverage and (2) whether there are less intrusive means of filing that gap than what is proposed in a prospective application under consideration. [*See Sprint Spectrum, L.P. v. Willoth,* 176 F.3d 630 (2d Cir.1999);

 and Resolution item [d] states that,

 the applicant has not conclusively shown that there is a legally-cognizable significant gap in coverage and that the location of a wireless telecommunications services facili-

ty on the existing structure located at 19 South Broadway, Tarrytown, represents the least intrusive means of filling the claimed gap[.]
 (Tedesco Aff. Exh. G.)

9. Although Omnipoint's complaint also contains claims based upon Defendants' alleged discriminatory and retaliatory conduct, which would fall under TCA subsection (7)(B)(i)(I), it bases the present motion solely on the Planning Board's effective prohibition of wireless services under (7)(B)(i)(II). (Pl. Main Brief at 2 n. 1.)

land lines." *Sprint Spectrum v. Willoth,* 176 F.3d 630 (2d Cir.1999). However, "once an area is sufficiently serviced by a wireless service provider, the right to deny applications becomes broader: State and local governments may deny subsequent applications without thereby violating subsection B(i)(II)." *Id.*

Tarrytown does not challenge the *sufficiency* of Omnipoint's showing that Omnipoint has a significant gap in its coverage. Rather, the Village argues that *Willoth* stands for the proposition that a significant gap in coverage occurs only when *no provider* has access to the land line system in a particular area that a coverage deficiency for a single provider, and that Omnipoint has not made a coverage gap showing with respect to other providers in the area. (Def. Brief at 19–20; Tedesco Aff. Exh. G.) I disagree with Defendants that *Willoth* so held.

That a "coverage gap" must be measured from the perspective of the individual provider, as Omnipoint suggests, or the perspective of users, as Tarrytown contends, has been the subject of some disagreement among the First and Third Circuits. The path of that disagreement has been discussed in detail elsewhere. *See Independent Wireless One Corp. v. Town of Charlotte,* 242 F.Supp.2d 409, 417–420 (D.Vt.2003) ("Courts interpreting the *Willoth* decision have differed in their determination of what constitutes a 'significant gap.' Several courts [Third Circuit] have interpreted the *Willoth* decision as holding that a gap must exist from the customer's, rather than the providers's perspective . . . Other courts [First Circuit], however, have looked at the gap from the provider's perspective, or at least from a technology perspective."). In *Town of Charlotte,* Magistrate Judge Niedermeier applied the First Circuit "provider perspective" approach to subsection B(i)(II) in finding that a local zoning board's denial of a provider's application had the effect of prohibiting coverage. In so doing, Judge Niedermeier cited the following concern:

> If the fact that a provider or providers have coverage in an area is sufficient reason to deny an application by a new provider, even if the provider's proposal is the least intrusive means by which it could fill the gap in its service, the existing companies will have a monopoly on the area and a disincentive to seek out new technological developments, subverting the TCA.

*Town of Charlotte,* 242 F.Supp.2d at 420; *but see Omnipoint Communications, Inc. v. The Port Authority of New York and New Jersey,* No. 99 Civ. 0060(BJS), 1999 WL 494120, at *12 (S.D.N.Y. July 13, 1999) (adopting Third Circuit approach); *SiteTech Group Ltd. v. The Board of Zoning Appeals of the Town of Brookhaven,* 140 F.Supp.2d 255, 264 (E.D.N.Y.2001) (same).

I conclude that subsection B(i)(II) should be construed from the provider's perspective.

■■■ On its face, *Willoth* holds that subsection B(i)(II) applies only "where a town's decision will have the effect of prohibiting personal wireless services in a given area." *Willoth,* 176 F.3d at 640. Thus, "A local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting wireless services if the service gap can be closed by less intrusive means." *Id.,* at 643. By contrast, subsection B(i)(I), which provides that towns "shall not discriminate among providers of functionally equivalent services," was intended to address a provider's "ability to compete with" other wireless services. *Willoth,* 176 F.3d at 640 (citing H.R. Conf. Rep. No. 104–458, at 208, *reprinted in* 1996 U.S.C.C.A.N. at 222 ("When utilizing the term 'functionally equivalent services'

the conferees are referring only to personal wireless services that directly compete against one another")). Congress has in fact addressed Judge Niedermeier's concerns about competition between providers—it just did so in a different subsection of the TCA. Thus, *Willoth* makes plain that the thrust of B(i)(II) is not on an applicant provider's competition with other providers, but on whether *the applicant provider* can offer area users some minimum level of service using the least intrusive means available. *See Second Generation Properties, LP v. Town of Pelham,* 313 F.3d 620, 632 n. 13 (1st Cir.2002) (noting that "The court's effective prohibition analysis [in *Willoth* ] does not discuss the provision of wireless services by other carriers").

On the issue of intrusiveness, *Willoth* states that,

> A local government may also reject an application that seeks permission to construct more towers than the *minimum required* to provide wireless telephone services in a given area [Ontario]. A denial of such a request is not a prohibition of personal wireless services as long as fewer towers would provide users in the given area with *some* ability to reach a cell site.

*Willoth,* 176 F.3d at 643 (emphasis added). Further,

> Where the holes in coverage are very limited in number or size (such as the interiors of buildings in a sparsely populated rural area, or confined to a limited number of houses or spots as the area covered by buildings increases) the lack of coverage likely will be de minimis so that denying applications to construct towers necessary to fill these holes will not amount to a prohibition of service.

*Willoth,* 176 F.3d at 643–644. Thus, for the purposes of B(i)(II), *Willoth* only directs a district court to consider whether the denial of an application of a given provider will result in the denial of cell service to users of that provider's service in the given area. There is no indication that the purpose of B(i)(II) is to ensure that all users a town have access to the best coverage (i.e. *seamless.*coverage) possible, only that they have some ability to reach a cell site.

Here, it is evident that a significant gap in Omnipoint's coverage exists. This evidence includes (1) a Radio Frequency Engineering Report submitted to the Planning Board by Omnipoint in its initial application, dated August 22, 2002, and amendment dated November 21, 2002 (Oct. 3 Peters Aff. Exh. 6); (2) a Radio Frequency Engineering Report submitted to the Planning Board by Omnipoint in its Amended Application, dated March 10, 2003 (*Id.* Exh. 12); and (3) substantial testimony during the public hearing process by Omnipoint's radio frequency expert, Michael Littman and his representatives. (Littman Aff. ¶¶ 10, 14, 17.)

The evidence submitted by Omnipoint, including coverage maps, demonstrated the existing gap in coverage and how the site would fill that gap in coverage and tie into Omnipoint's existing surrounding facilities. (Littman Aff. ¶¶ 3, 5, 11, 14.) Omnipoint demonstrated that the height of the building at 19 South Broadway was the *minimum* height needed to provide the necessary coverage. (*Id.* ¶¶ 5, 14.) The propagation analysis and coverage maps were further verified using actual field test data to provide for the most accurate representation of the expected coverage. (*Id.* ¶¶ 3, 12.)

Moreover, throughout the public hearing process, Defendants' consultants consistently agreed with the conclusions of Omnipoint's experts that a significant gap in coverage exists in the Village and that the proposed Facility at 19 South Broadway

would close that gap. (Peters Aff. ¶¶ 24, 31, 41. 62.) Even the Planning Board Members stated that Omnipoint had shown a significant gap in coverage (Littman Aff. ¶ 18.) As such, the Planning Board's finding that insufficient evidence of a gap exists is not supported by substantial evidence.

Having established that a significant coverage gap exists, the analysis then shifts to whether Tarrytown's Planning Board had a adequate basis in state or local law to deny Omnipoint's attempt to remedy the coverage gap. *Willoth*, 176 F.3d at 644 ("the TCA itself does not provide the legal basis to deny an application to construct a personal wireless facility. That authority must be found in state or local law."). A zoning determination

cannot be sustained where it "is affected by an error of law." *Id.*, at 645 (quoting *WEOK Broadcasting Corp. v. Planning Board of Lloyd*, 79 N.Y.2d 373, 383, 583 N.Y.S.2d 170, 592 N.E.2d 778 (1992)). I find that Tarrytown does not have an adequate legal basis for denying Omnipoint's application, and therefore it cannot be sustained.

### B. *The Zoning Code*

In paragraphs [e] through [l] of the Resolution, the Planning Board denied the Omnipoint application based upon alleged visual impacts as well as impacts to health, safety, welfare, areas of historical significance and failure to sufficiently review alternative sites.[10] The Planning Board's

---

**10.** The relevant paragraphs of the Resolution are as follows:

WHEREAS, [e] the applicant has not submitted sufficient data regarding potential alternative sites pursuant to Section 305–80.A(2) of the Tarrytown Zoning Code; and

WHEREAS, [f] the applicant has not factually demonstrated that the proposed site is the only site which can be leased or selected by the applicant for physical, technological, legal or financial reasons pursuant to Section 305–80.A(3) of the Tarrytown Zoning Code; and

WHEREAS, [g] the applicant has not submitted a satisfactory written report demonstrating the applicant's review of the alternative wireless telecommunications services facility location[s] in order of priority, demonstrating the technological reason for selecting 19 South Broadway, Tarrytown pursuant to Section 305–80.B of the Tarrytown Zoning Code[.]

WHEREAS, [h] pursuant to Section 305–80.A(5) of the Tarrytown Zoning Code the Planning Board finds that the site is not in the best interest of the health, safety and welfare of the village; and

WHEREAS, [i] the proposed antenna location at 19 South Broadway is in gross violation of the setback and fall zone provisions found Sections 305–82.A and 305–82.B of the Tarrytown Zoning Code—with respect to the minimum setback requirements—as close as 0.1 feet from the nearest residential

property owner and therefore 99.8% out of compliance and,—with respect to the fall zone requirements—the applicant proposes to construct an antenna which would protrude past the outline of 19 South Broadway and given a height of 65 feet, the possibility exists that debris or ice [in winter] would pose a substantial risk to residents of South Broadway especially given the violation of the aforementioned set back provisions of the zoning code; and

WHEREAS, [j] 19 South Broadway is a residential structure [apartment building] which is surrounded on at least three sides by single and multi-family homes and the application violates the clear legislative intent of the location priority rankings found in Section 305–80.A(1) is to locate wireless telecommunications services facility to existing non-residential buildings and areas of zoned for industrial and commercial uses within the village; and

WHEREAS, [k] Section 305–80.D(4) of the Tarrytown Zoning Code provides that the Planning Board may disapprove an application where the granting of the same creates a discernible visual or aesthetic impacts in proximity to residential or noncommercial uses and the Planning Board has found that there may be a visual and aesthetic impact if the applicant is permitted to construct a wireless telecommunications services facility on the existing structure located at 19

attempted reliance upon these purported impacts is not supported by the record.

### 1. Zoning Code Section 305

First, the Planning Board argues that Omnipoint failed to comply with § 305 of the Tarrytown Zoning Code. The Wireless Zoning Code contains a detailed procedure for the Planning Board to consider the locating of a wireless facility within the Village. (Oct. 3 Peters Aff. Exh. 8.) A central component of this scheme is a priority list for the placement of wireless facilities. (*Id.* at § 305–80(A)(1).) An applicant seeking to locate a wireless facility within the Village is required to "seek permission form the Village to locate, site and erect the [wireless facility] in accordance with the following priorities[ . . . ]" (*Id.*) The top priority in the Code is "Collocation on a site with existing telecommunications towers or structures containing existing telecommunications facilities." (*Id.*) The fifth ranked priority in the Code is "Collocation on existing telecommunications towers or structures in residential districts." (*Id.*) In addition, § 305–76 specifies that one of the purposes of the Code is "to limit the new WTSFs to existing nonresidential building and areas zoned industrial and commercial uses." (*Id.* at § 305–76(G).) Another purpose is to "Maximize the use of any proposed site by encouraging collocation and multiple use of WTSFs to the extent reasonably permissible." (Id. at § 305–76(D).) [11]

Omnipoint seeks to construct its Facility on a residential building, but one that already houses a WTSF, and that is situated in a *nonresidential* district in Tarrytown. The Planning Board determined that Omnipoint's application was a Priority Five ranking under Code § 305–80A. On its face, it appears that the Board's determination was in error, as the site would be located on an existing structure (a building located at 19 South Broadway) that contains existing telecommunications facilities belonging to a competitor of Omnipoint, Nextel—the hallmarks of a Priority One ranking. (Oct. 3 Peters Aff. ¶¶ 6, 29.) The 19 South Broadway location also satisfies the purpose of the Code to limit new WTSFs to areas zoned for commercial use and to encourage collocation (even if it is does not satisfy the purpose of locating it on a residential building).[12] Moreover,

South Broadway, Tarrytown, New York; and

**WHEREAS**, [1] 19 South Broadway, Tarrytown, New York is in an area of the village of historical significance to the village and Section 305–80.D(3) of the Tarrytown Zoning Code provides that the Planning Board may disapprove an application for the construction of a wireless telecommunications services facility where the granting of the same may have an impact on an area of historical significance[.]

11. At the June 23, 2003 public hearing, Chairman Friedlander stated "the intent of the Village was to not have new antennas on residential buildings and its was legislation the Village studied for a long time before passing." (Tedesco Aff. Exh. C). In fact, the "legislative intent" section of the Village Code, § 305–75, contains no expression of preference for the siting of wireless facilities on "nonresidential" buildings. Instead, it focuses on the intent to "avoid blight, to prevent the interruption of viewsheds," to preserve the aesthetic character of the Village, and to promote the safety and welfare of residents. (Oct. 3 Peters Aff. Exh. 8.)

12. Defendants' argue that 19 South Broadway is really located in a residential district. The basis for Defendants argument in that 19 South Broadway is located in a "Restricted Retail Zone," which, under the Tarrytown Zoning Schedule, permits residential uses. Further, the South Broadway/Main Street area in the Village is characterized by structures which are residential—for example, 19 South Broadway is a 6 story cooperative apartment—and which contain some retail activity on the first floor. (Tedesco Aff. ¶ 20.) Defendants' interpretation, however, is in bla-

Tarrytown's consultants, AKRF, determined that the 19 South Broadway was a Priority One location (Oct. 3 Peters Aff. ¶ 13 Exh. 14). The Planning Board's designation of Omnipoint's proposed WTSF as a Priority Five building was therefore incorrect as a matter of law.

Pursuant to § 305–80(A)(2) of the Zoning Code, applicants proposing wireless facilities must only review alternatives "[i]f the proposed [wireless facility] is *not* to be located on a site with existing telecommunications towers or structures containing existing telecommunications facilities[.]" Section 305–80(A)(3) only requires an applicant to demonstrate that the site was selected for "physical, technological, legal or financial reasons" where the applicant seeks to "bypass sites of higher priority[.]" Because Omnipoint proposed a collocated facility that satisfied the highest priority of the Zoning Code, neither of these provisions provided any basis for the denial of the Omnipoint application.[13] As such, the Planning Board's attempt to rely on these provisions in paragraphs [e] and [f] of the Resolution was misplaced.

In addition, the Zoning Code allows the Planning Board to "*approve* any site located within an area in the above list of priorities, provided that the Board finds that the proposed site is one that is in the best interest of the health, safety and welfare of the Village and its inhabitants." Zoning Code § 305–80(A)(5). Under this provision, the Planning Board was allowed to approve facilities that failed to meet the strict priority requirements identified under the Code. Section 305–80(A)(5) does not provide the Planning Board with discretion to *disapprove* an application that

otherwise fully complied with the priority requirements. As such, the Planning Board's reliance on this section in paragraph [h] of the Resolution is misplaced.

■ The legal basis for Planning Board's discretion to *disapprove* a facility that otherwise meets the Code's priority requirements is found in Section 305–80(D), which allows the Planning Board to "disapprove" a potential site that would be located in the highest priority area available in certain limited circumstances. § 305–80(D) provides:

Notwithstanding that a potential site may be situated in an area of highest available priority, the Board may *disapprove* an application or condition the granting of an application, where granting of the application as submitted would violate any of the following considerations:

(1) Safety and safety-related codes and requirements.

(2) Traffic patterns or traffic laws.

(3) Historic nature of a designated neighborhood or historical district or deemed eligible to be registered regardless of whether any of the properties within such district have been registered on the national or state register of historic places.

(4) Proximity to residences or other noncommercial uses so as to create discernible impact upon an adjoining property by virtue of visual or aesthetic impacts that are out of keeping with the area.

(5) The Village Zoning Code or the Village Comprehensive Plan.

---

tant contradiction with the plain language of the Village Zoning Code, § 305–4 and Zoning Schedules, which classifies Restricted Retail districts as "Commercial Districts." (Affidavit of Michael Peters, dated October 24, 2003 ¶ 16 Exh. A.) Moreover, as Mr. Tedesco himself confirms, 19 South Broadway is not merely located in a commercial zone, it is in fact used for commercial retail purposes.

**13.** AKRF agreed these sections do no apply to Omnipoint. (Oct 3 Peters Aff., Exh. 14 at 2.)

(Emphasis added.) Accordingly, the Planning Board relies on §§ 305–80(D)(3) and (4) to justify its denial of the Omnipoint application, both of which relate to the aesthetic impact of the proposed Facility. (Resolution ¶¶ [1] and [k].)

### 2. Aesthetic Impact

Defendants' contention that the Planning Board's denial was based in part on adverse aesthetic impact on Tarrytown residents contradicts the evidence in the record. Defendants' argument seems to be based almost entirely on the complaints of a small number of residents at the public hearings about possible visual impacts in the immediate neighborhood of the site or the surrounding national historic district. As a matter of law, however, unsubstantiated community objection to aesthetics is not sufficient evidence by itself to support the Planning Board's denial. *See Town of Oyster Bay*, 166 F.3d 490, 496 (2d Cir.1999) (noting that a "few generalized expressions of concern with 'aesthetics' cannot serve as substantial evidence on which the Town could base the denials"). To the extent that the record contains any other indication of aesthetic impact, that evidence is substantially outweighed by AKRF's conclusions that the application "will not affect the historic nature of the Historic Main Street District or any other locally-designated historic district" and "will not create any visual or aesthetic impact that will have a measureable effect on adjoining properties." (Oct. 3 Peters Aff. ¶¶ 51–53, 71–72). Additionally, the Planning Board appears to have discounted entirely a letter from the New York State Office of Parks, Recreation and Historic Preservation Office ("SHPO") sent to the Planning Board stating that there would be no impact upon areas of historical significance. (*Id.* Exh. 18.) Thus, I cannot say that the Planning Board has offered more than the scintilla

of evidence necessary to qualify aesthetics as a permissible ground for denial of Omnipoint's permit.

### 3. The Setback

■ In paragraph [i] of the Resolution, the Planning Board denied the Omnipoint application based upon the "substantial risk to residents of South Broadway" that would be caused by Omnipoint's request for a waiver of the Wireless Zoning Code's setback requirements. Code § 305–82 requires that any WTSF proposed on an existing structure or building comply with the building set-back provisions of the district in which the facility is located. Zoning Code § 305–82. The Code also requires a "fall zone" be provided unless "the Board finds that a substantially better design will result from a reduced set-back." *Id.* While Omnipoint does not deny that its application violates the set-back requirement, it argues that there is no evidence of any risk to South Broadway residents contained in the record and, because the flush-mounting proposed by Omnipoint results in a "substantially better design," the setback waiver it has requested is consistent with the Wireless Zoning Code.

There is no evidence in the record indicating that Omnipoint's design constitutes a safety risk or will create a visual or aesthetic impact. Omnipoint's structural engineer found that "[t]he flush mounted antennas will pose no risk of falling off the building due to wind, ice or any other natural means." (Oct. 3 Peters Aff. Exh. 12, Structural Letter.) In its March 28, 2003 letter to the Planning Board, AKRF confirmed Omnipoint's position, stating that, "mounting the antenna panels to the facade of the structure flush with the top of the parapet wall is an acceptable method of reducing the potential visual impact of the antennas." (*Id.* ¶ 55.) Accordingly, AKRF recommended that the "Planning

Board waive the requirement for a 'fall zone' setback as the proposed facility appropriately minimizes visual impacts of the project." (*Id.*)

Cerami & Associates confirmed the benefits of flush-mounting the antennas in an April 17, 2003 letter to the Planning Board stating that Omnipoint had adequately addressed all of their previous comments and requests for additional information. Notably, Cerami & Associates also recommended the Planning Board grant Omnipoint's waiver of the setback requirement to enable the antennas to be flush-mounted on the exterior of the building. (Oct Peters Aff. ¶ 67.) Neither the Cerami letter nor the AKRF letter noted any problems associated with the previously-approved Nextel installation of flush-mounted antennas at 19 South Broadway. Indeed, the only basis for the Planning Board's decision seems to have been the concerns expressed by a few local residents at the public hearings. (Tedesco Aff. Exh. C.) This evidence cannot serve as an adequate basis on which to deny Omnipoint's application for a variance. *Nextel Partners, Inc. v. Town of Amherst, N.Y.*, 251 F.Supp.2d 1187, 1198 (S.D.N.Y.2003) ("The local board charged with reviewing special use applications, while not divested of all discretion by the TCA, must nevertheless base a denial upon proof pertinent to the legislative conditions and not merely upon generalized community objections") (citations omitted).

■ In addition, under New York law, a public utility such as Omnipoint is entitled to a necessary variance where it can show that the "modification is a public necessity in that it is required to render safe and adequate service, and that there are compelling reasons, economic or otherwise, which make it more feasible to modi-

fy the plant than to use alternative sources of power such as may be provided by other facilities" and that "where the intrusion or burden on the community is minimal, the showing required by the utility should be correspondingly reduced." *Cellular Telephone Co. v. Rosenberg*, 82 N.Y.2d 364, 372, 604 N.Y.S.2d 895, 624 N.E.2d 990 (quoting *Matter of Consolidated Edison v. Hoffman*, 43 N.Y.2d 598, 611, 403 N.Y.S.2d 193, 374 N.E.2d 105 (1978)). Here, Omnipoint has demonstrated the necessity of the Facility and that the intrusion caused by its requested waiver will be *de minimis*. *See Omnipoint Communications, Inc. v. City of White Plains*, 175 F.Supp.2d 697, 714–715 (S.D.N.Y.2001). As such, the Planning Board erred as a matter of law in denying the requested setback waiver.

Moreover, Omnipoint and both of the Planning Board's expert consultants agree that flush-mounting the antennas would result in a "substantially better design" and that Omnipoint should be granted a waiver of the setback requirement to allow it to flush-mount its antennas. Accordingly, the Omnipoint application fully complied with § 305–82 of the Village Zoning Code and the Planning Board's purported reliance on Omnipoint's noncompliance with the setback requirements as a basis for denial of the Omnipoint application was not supported by substantial evidence.

## C. SEQRA

■ The Planning Board also purported to deny Omnipoint's application based on the fact that Omnipoint failed to show that it was not engaged in "impermissible segmentation" under the State Environmental Quality Review Act ("SEQRA") through its ongoing efforts to site other wireless facilities in the vicinity of the Village (Resolution ¶ [b].)[14] In addition, De-

---

14. Paragraph [b] provides that:

**WHEREAS**, [b] the applicant has not pro-

vided sufficient evidence and/or informa-

fendants allege that SEQRA expressly requires the review of alternative sites.

 The Planning Board has presented insufficient evidence of impermissible segmentation. To be sure, "[a]n agency making a SEQRA determination is required to consider the cumulative impact of its action when applications are related . . . and it may choose, in its discretion, [to examine or] not to examine the cumulative impact of separate applications within the same geographic area." *Willoth,* 176 F.3d at 647. However, the Planning Board's finding that Omnipoint has not submitted sufficient information on segmentation is contradicted by the record. First, the Planning Board's own consultant found that segmentation was not an issue with regard to the Facility.[15] Second, there is no indication from the record that any of the sites proposed for Tarrytown by Omnipoint are well-developed or imminent, and therefore no "close nexus" between the Application and the identified cumulative effects is present as was the case in *Willoth,* 176 F.3d at 647 (noting that two other cellular providers had been licensed by the FCC for the area, and based on recent hirings it appeared likely that at least one would soon deploy and make applications). Finally, even if the application for the Sleepy Hollow site is relevant for segmentation purposes, Omnipoint's Radio Frequency Engineering Report expressly considers the field exposure to the public from the "simultaneous and continuous operation of *all proposed* and existing transmitters (including the Sleepy Hollow proposal)." (Peters Aff. Exh. 12) (emphasis added.)

 In addition, the Planning Board had no authority to require Omnipoint to consider alternatives pursuant to SEQRA. It is equally well-settled in New York that preparation of an environmental impact statement (which includes a consideration of alternatives) is only required for actions that are likely to result in significant adverse environmental impacts. *See* N.Y. Envtl. Conserv. L. § 8–0109 (agency required to "prepare . . . an environmental impact statement on any action . . . which may have a significant effect on the environment"). As the Planning Board's own consultant, AKRF, explained:

> [u]nder SEQRA, alternatives are considered when a proposal has the potential to generate significant adverse environ-

tion to confirm that the application is not part of an overall development plan to improve service which may present impermissible segmentation pursuant to SEQR given applicant's apparent plan to build a wireless telecommunications services facility in the neighboring Village of Sleepy Hollow and the possibility that it may locate a wireless telecommunications services facility in south Tarrytown[.]

**15.** AKRF, for example, advised the Planning Board that segmentation was simply not at issue on the Omnipoint application:

> Under SEQRA, segmentation is a concern when related facilities would have cumulative environmental impacts that would not otherwise be detected if the facilities were examined independently. As noted in our previous letter (dated 3/28/03), AKRF believes the applicant has adequately demonstrated that there will be no significant adverse environmental impacts as a result of the proposed WTSF. The only potential effect would be a change in visual character, namely the effect of adding a new WTSF to a rooftop where WTSF are currently located. However, the applicant has demonstrated that this potential effect would not be significant or adverse. It is our opinion that installation of another such facility within Tarrytown would not result in any cumulative impact and that independent review of this application and any future WTSF applications by Omnipoint does not constitute an impermissible segmentation under SEQRA.

(Oct. 3 Peters Aff. Exh. 24.)

mental impacts. In the Full Environmental Assessment Form (EAF) dated 3/13/03, the applicant demonstrates that there will be no significant adverse environmental impacts as a result of the proposed WTSF. Therefore, an EIS does not need to be prepared and the Planning Board should issue a negative declaration.

(Peters Aff. Exh. 24.) Given the lack of substantial evidence to support its conclusion that significant adverse environmental impacts exist here, it was error for the Planning Board to conclude that Omnipoint engaged in impermissible segmentation.

Because the Planning Board denial of Omnipoint's application has not been shown to be based on substantial evidence, I find that the Planning Board has violated subsection B(i)(II) of the Telecommunications Act by effectively prohibiting the provision of personal wireless services to Omnipoint users in Tarrytown. The Planning Board simply has failed to offer one legitimate reason for its rejection of the Omnipoint's application. Therefore, Plaintiff is entitled to summary judgment on its Third Cause of Action.

### III. Remedy

▮▮▮ Omnipoint also seeks permanent injunctive relief.[16] In this Circuit, the standard for a permanent injunction is essentially the same as for a preliminary injunction: (1) irreparable harm and (2) success on the merits. *See University of Texas v. Camenisch,* 451 U.S. 390, 392, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Dodge v. County of Orange,* 282 F.Supp.2d 41, 71 (S.D.N.Y.2003). "Courts have consistently found that a mandatory injunction is an appropriate remedy for violations of the

TCA." *Nextel Partners, Inc. v. Town of Amherst, N.Y.,* 251 F.Supp.2d 1187, 1200 (W.D.N.Y.2003) (collecting cases); *see also Cellular Telephone Co. v. The Town of Oyster Bay,* 166 F.3d 490, 496 (2d Cir. 1999) (finding that TCA does not specify a remedy for violations and that a majority of district courts have held that the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits).

The facts of this case, unfortunately, follow an all too familiar pattern. A wireless provider submits an application to extend its cellular coverage in a locality, only to be confronted with politically motivated, interminable, delays and ineffectual excuses by local officials for their failure to act on the application in a timely fashion. *See e.g., Town of Amherst, N.Y.,* 251 F.Supp.2d at 1201–1201. Here, Omnipoint made its initial application for a permit in early September 2002. Eight months later, the Planning Board suggested its preferred alternative site at Christ Church. It took several more months for the Planning Board to finally issue a decision denying Omnipoint's application based on varying rationales and in the face of directly contradictory advice from the Board's own consultants. Thus, this is not a case where the locality was merely conducting good faith information gathering based on the conclusions of its expert that it needed more information about the proposed wireless project. *See e.g. Nextel Partners of Upstate New York v. Town of Canaan,* 62 F.Supp.2d 691 (N.D.N.Y.1999). Rather, had Omnipoint not filed the instant suit, it is clear to me that Tarrytown would have "transform[ed] the application into a self-perpetuating, endless odyssey." *Id.,* at 695.

---

**16.** Omnipoint's request for a preliminary injunction is mooted by the grant of summary judgment.

I therefore conclude that "further review by defendants would serve no useful purpose and would greatly prejudice [Omnipoint] by further delaying its ability to provide service to the public in a non-covered area," *Town of Amherst, N.Y.*, 251 F.Supp.2d at 1201, and that immediate injunctive relief is the appropriate remedy for Defendants' violation of the TCA.

## CONCLUSION

For the reasons discussed above, I hereby grant partial summary judgment in favor of the Omnipoint on its third and seventh causes of action seeking a declaratory judgment that the Planning Board violated the TCA and directing the Village of Tarrytown Planning Board to issue any and all approvals necessary for installation of the Omnipoint's wireless telecommunication facility application.

IT IS SO ORDERED.